```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
                                            Docket No.:
ARCH BROKERAGE LTD.,

             Plaintiff,                     COMPLAINT

  - against -                               JURY TRIAL DEMANDED

BP/CGCENTER II LLC d/b/a
BOSTON PROPERTIES,

             Defendant.
--------------------------------X
```

Plaintiff Arch Brokerage Ltd. ("Arch" or "Plaintiff"), by and through its attorneys McLaughlin & Stern, LLP, as and for its Complaint against defendant BP/CGCENTER II LLC d/b/a Boston Properties ("Boston Properties" or "Defendant"), alleges as follows:

**PARTIES**

1. Plaintiff is a domestic corporation duly licensed to conduct real estate brokerages services within the State of New York. Plaintiff's principal place of business is in New York County.

2. Defendant is a Delaware limited liability company with its principal place of business in Massachusetts.

1

**JURISDICTION**

3. This Court has jurisdiction over the action pursuant 28 U.S.C. § 1332 (diversity jurisdiction).

4. Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred, or a substantial part of property that is the subject of the action is situated, in this district. In addition, venue is proper because defendant is subject to the court's jurisdiction with respect to this action.

**FACTS COMMON TO ALL CAUSES OF ACTION**

5. Arch is the tenant's broker of record for Anna Castellani ("Castellani") and the DeKalb Market Hall (the "Market Hall") located in Brooklyn, New York.

6. Castellani created the Market Hall to showcase 40 culinary vendors who reflect the cultural and ethnic diversity of Brooklyn. The Market Hall also provides a venue for entertainment.

7. Boston Properties owns the real estate located at 601 Lexington Avenue, New York, New York also known as the "Citigroup Center" ("Citigroup Center").

8. Boston Properties' broker of record for the Citigroup

Center is Cushman & Wakefield ("Cushman").

9. Boston Properties wanted a tenant similar to the Market Hall at the Citigroup Center. As a result, Steven Soutendijk ("Soutendijk"), an Executive Managing Director of the Retail Services Group from Cushman, emailed Castellani and her broker from Arch, Larry Roberts ("Roberts").

10. At all relevant times, Roberts was a principal and duly licensed broker at Arch.

11. On September 15, 2017, Soutendijk emailed the following to Castellani and Roberts:

> Anna and Larry – I am the agent for 601 Lexington Avenue f/k/a Citigroup Center. Boston Properties has requested that I reach out to you for an approximately 10,000 SF space on their redeveloped office tower, located at the corner of 53rd Street and Lexington Avenue.
>
> I am attaching a deck on the project for your review. If you have any free time over the next few weeks, we would welcome the opportunity to walk you thru the project and to meet with you. Let me know – we will work around what I'm, sure is a busy time for you.

12. Roberts, on behalf of Castellani, responded directly to Soutendijk on September 16, 2017 as follows: "Thanks Steve … Let us review and get back to you."

13. On September 19, 2017, Roberts emailed Soutendijk requesting that he and Castellani take a tour of the space on

September 27th at 11:30am.  Soutendijk responded only to Roberts: "Larry – back to you quickly.  I think it will work, or we will make it work!"  A few hours later Soutendijk asked: "Larry – can you do noon on 9/27?"

14.  Roberts then arranged for him and Castellani to meet Soutendijk on September 27, 2017 at noon to tour the space.  Roberts sent Soutendijk an email stating that he would meet Soutendijk "in front of Hillstone on third tomorrow @ 12:00?"

15.  Roberts then organized and sent a meeting confirmation notice to Soutendijk and five representatives from Boston Properties (Kaitlyn Phelps, then-Leasing Representative; Heather Kahn, Vice President; Richard Monopoli, Senior Vice President of Development; Andrew Levin, Senior Vice President; and John Powers, Executive Vice President – New York Region).  Soutendijk and all of the Boston Properties' representatives responded that they would attend the meeting with Roberts and Castellani.

16.  On September 26, 2017, Soutendijk emailed Roberts: "Hoped to meet in front of 24 Hour Fitness, on 53rd between Lex and Third.  If there is time, we would like to take you guys to our marketing center across the street to give you a quick video presentation – if not, we can just walk the site."

17.  Roberts, on behalf of Castellani, agreed and

4

responded: "12:00 – 24 Hour Fitness, on 53rd between Lex and Third See you then"

18. Soutendijk repeated his request to Roberts: "Would you like a ten minute presentation prior to the walkthrough or is time tight?"  Roberts responded: "We want the full show [thumbs-up emoji]."

19. Roberts and Castellani attended the presentation and walkthrough.

20. Two days later, on September 29, 2017, Richard Monopoli ("Monopoli"), Senior Vice President of Development at Boston Properties, emailed Roberts and Castellani thanking them for meeting and discussing "your DeKalb Market concept." Monopoli attached files and renderings for their review and asked for a tour of the Market Hall.

21. Roberts, on behalf of Castellani, responded by inviting Soutendijk and four of the representatives from Boston Properties for lunch and a tour at the Market Hall.

22. Roberts organized and sent a lunch invitation for October 20, 2017 at 12:30pm to Soutendijk, Kaitlyn Phelps (then-Leasing Representative at Boston Properties), Heather Kahn (Vice President at Boston Properties), Monopoli, and Andrew Levin (Senior Vice President at Boston Properties).  Soutendijk and

the representatives from Boston Properties responded that they would attend.

23. After the luncheon and tour of the Market Hall, Roberts followed up with Soutendijk with respect to certain questions about the space. Among other things, Roberts asked about the size of the food hall space, referenced Slide A-209.00 from the project deck and asked about the dimensions on the actual rentable space, and then worked with Castellani on a plan to rent the space from Boston Properties.

24. A few days later, on October 27, 2017, Roberts emailed Soutendijk and Andrew Levin ("Levin"), Senior Vice President at Boston Properties, requesting an additional walkthrough of the space.

25. Soutendijk agreed and asked if Roberts and Castellani "would be available for 15 minutes before the walk thru to meet with John Powers who runs the NYC office for [Boston Properties] tomorrow? He asked to meet you guys." Roberts, on behalf of Castellani and himself, asked "Ok meet you 11:15?", to which Soutendijk responded "Yep, let's meet lobby of 559 Lex where [Boston Properties'] office is."

26. Soutendijk then sent Roberts an invite to meet with John Powers and walkthrough the space again. Castellani and

Roberts accepted the invitation. They met Roberts in his office. Thereafter, Castellani and Roberts toured the space with Soutendijk.

27. On November 6, 2017, Soutendijk sent plans for the space to Roberts and Castellani for their review.

28. In early February 2018, Melissa Cohen (Senior Project Manager of Development at Boston Properties) and Roberts (on behalf of Castellani) began negotiating a term sheet for a 15 year lease.

29. During the course of these negotiations, Boston Properties' representatives stopped responding to Roberts.

30. Boston Properties later refused to formally acknowledge Arch or Roberts as the tenant's broker of record after six months of working together and cut them out of the deal.

31. In July 2019, after several months of lease negotiations between counsel for the parties, a single purpose entity created by Castellani entered into a 15 year lease with Boston Properties for the space at issue. The annual rent was in excess of $1,000,000 per year.

31. Although duly demanded, Boston Properties has refused to pay Arch a full, ordinary and customary commission used in

the industry which is also in accordance with Arch's usual and customary rates.

## AS AND FOR A FIRST CAUSE OF ACTION
### (New York Common Law Right to Brokerage Commission)

32. Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as though more fully set forth herein again at length.

33. Plaintiff is a duly licensed real estate brokerage corporation.

34. Plaintiff was the procuring cause of Castellani through her single purpose entity leasing the space from the Defendant.

35. Castellani through her single purpose entity was a ready, willing and able tenant who, in fact, leased the space from Defendant.

36. Defendant expressly and/or implicitly agreed to pay Plaintiff a real estate commission if it found a ready, willing and able tenant for the space.

37. Over the course of 6 months, Plaintiff communicated directly to Defendant's broker and Defendant's employees, reviewed the project deck, renderings, plans, and files, toured the space multiple times, arranged for the principals to meet, organized meetings, tours of the space and the Market Hall,

8

sponsored the luncheon between principals, attended marketing presentations, inquired about the space and its dimensions, worked on a rental plan, and negotiated the term sheet until Defendant cut Plaintiff out of the deal.

38. Plaintiff acted as a catalyst in the resulting lease and Defendant accepted the fruits of Plaintiff's labor in obtaining a signed lease. Yet, Defendant refused to recognize Plaintiff as the broker of record.

39. It is a well-settled rule that even in the absence of an express agreement, a real estate broker will be deemed to have earned its commission when it produces a renter who is ready, willing and able to rent at the terms set by the landlord.

40. Moreover, Plaintiff's ultimate right to compensation is not dependent or contingent upon the performance of the underlying lease or the receipt of rent. Once a lease is signed, Plaintiff was entitled to its commission from the Defendant.

41. Defendant consciously appropriated Plaintiff's labor by accepting its services without objection and then refused to compensate Plaintiff.

42. At all times, Plaintiff reasonably expected to be

compensated for its services by the Defendant.

43.  When Defendant executed the lease, Plaintiff's work was done and earned a commission.

44.  As a result, Plaintiff is entitled to a commission under the common law in the sum of no less than $770,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Quantum Meruit)

45.  Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as though more fully set forth herein again at length.

46.  Plaintiff performed the *bona fide* real estate brokerage services for Defendant as set forth above and reasonably expected to be compensated for same.

47.  Plaintiff performed said services in good faith and in a satisfactory manner resulting in a duly executed lease.

48.  Defendant engaged with Plaintiff and accepted Plaintiff's services without objection and has refused to compensate Plaintiff for its work and efforts.

49.  Plaintiff reasonable expected and is entitled to the reasonable compensation for the services it performed for, and at the request of, Defendant.

50.  Defendant used Plaintiff as a catalyst to negotiate and find a tenant for the Citigroup Center.

51. Plaintiff is entitled to recover the reasonable value of its services.

52. By reason thereof, Plaintiff is equitably entitled to the fair and reasonable value of its services in an amount which is to be determined at trial, but in no event less than $770,000.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Unjust Enrichment)

53. Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as though more fully set forth herein again at length.

54. Based upon Plaintiff's labor, Defendant received a tenant for its space for 15 years with rental income of no less than $1,000,000 per year.

55. Defendant did not and refuses to compensate Plaintiff for its services.

56. Although Defendant stands to gain in excess of $15,000,000 over the course of the lease, it has refused to pay Plaintiff the usual and customary commission for its services.

57. Plaintiff performed the *bona fide* real estate brokerage services for Defendant as set forth above in good faith and reasonably expected to be compensated for same.

58. Defendant should not be able to retain that which Plaintiff seeks to recover.

59. Equity and good conscience dictate that Defendant should reasonable compensate Plaintiff for its work and efforts.

60. By reason thereof, Defendant has been unjustly enrichment in an amount to be determined at trial but no less than $770,000 and Plaintiff should be equitably entitled to same.

**WHEREFORE**, Plaintiff demands judgment against the Defendant on each cause of action in the sum of no less than $770,000, plus pre and post judgment interest, costs, disbursements, and such other and further relief as the Court deems proper.

Dated:   New York, New York
         August 20, 2019

McLaughlin & Stern, LLP

By: *Alan E. Sash*
Alan E. Sash
260 Madison Avenue
New York, New York 10016
(212) 448-1100

*Attorneys for Plaintiff*